IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MICKEY RAY TAYLOR, JR.,

      Plaintiff,

v.                                        1:20-cv-00536-DHU-JMR

TREY THOMPSON, SERGEANT
CASTANEDA, CORPORAL COX,
SERGEANT GRIFFIN, SERGEANT
RICHARD, DIVISION CAPTAIN DOE,
and CITY OF CARLSBAD,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER comes before the Court on the Motion for Summary Judgment filed by defendants City of Carlsbad, Trey Thompson, Jacob Castaneda, Bryant Cox, Jason Griffin, and Richard Cage (collectively, the "City Defendants"). Doc. 205. Prior to being served with the motion, plaintiff Mickey Ray Taylor, Jr. filed a response. Doc. 238. After being served, he filed a second response. Doc. 249. The City Defendants filed a reply. Doc. 258. The Honorable District Judge David H. Urias referred the case to me pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (b)(3) to conduct hearings, if warranted, and to perform any legal analysis required to recommend to the Court an ultimate disposition of this case. Doc. 60. Having reviewed the parties' submissions and the relevant law, I recommend that the Court GRANT the City Defendants' Motion for Summary Judgment (Doc. 205) and dismiss all claims against the City Defendants with prejudice.

I.    **Material Facts**[1]

Plaintiff Mickey Ray Taylor, Jr. is an incarcerated, *pro se* litigant. *See* Doc. 109. The basis of this lawsuit is an altercation Mr. Taylor had with law enforcement officers on February 3, 2019. *Id.*

On February 3, 2019, Corporal Trey Thompson was dispatched to a Wal-Mart in Carlsbad, New Mexico. UMF ¶ 1. Corporal Thompson was the sole responder to a call complaining about a subject drinking stolen whiskey from the Wal-Mart and hitting the store windows. UMF ¶ 2; *see also* Doc. 81 (Exh. C-1) (BN 188, BN 189, BN 190, BN 191, BN 196) (footage depicting Mr. Taylor's conduct before Corporal Thompson arrived). When Corporal Thompson arrived at the Wal-Mart several bystanders directed him towards Mr. Taylor. UMF ¶ 4. At the time, Mr. Taylor was a relatively large man, standing roughly 6'2" and weighing 250 pounds.  Doc. 81-11 (Exh. G). Corporal Thompson approached Mr. Taylor and told him to "turn around," which he did. Doc. 205 (Exh. A-1) 00:11-13. However, when Corporal Thompson moved to handcuff Mr. Taylor, Mr. Taylor pulled away, suddenly shouting, "You're not a cop. He's not a cop!" *Id.* at 00:15-42. In response, Corporal Thompson pulled out his taser. *Id.* Mr. Taylor began walking away, continuing to yell. *Id.* Corporal Thompson warned, "I am going to tase you. Get on the ground." *Id.* Mr. Taylor continued to back away. *Id.* Corporal Thompson repeated, "Get on the ground. Get on the ground. You are going to get lit up." *Id.* Mr. Taylor

---

[1] The parties significantly disagree on the facts of this case. For undisputed facts noted in the City Defendants' Motion for Summary Judgement, the Court cites to the Undisputed Material Fact ("UMF") section of the motion. Doc. 205 at 3–7. For facts that are plainly ascertainable from the record—for example, the video footage and Mr. Taylor's medical records—I cite to the record. *See* Fed. R. Civ. P. 56(c)(3) ("The Court need consider only the cited materials, but it may consider other materials in the record."). I draw all reasonable inferences in the light most favorable to plaintiff. *Scott v. Harris*, 550 U.S. 372, 377 (2007).

replied, "You're not a cop. Don't you stun me." Doc. 205 (Exh. A-1) 00:15-42. Corporal

Thompson then deployed his taser. *Id.* The taser hit Mr. Taylor in the back, and Mr. Taylor

swiftly swatted the taser wires away. *Id.* Then, in quick succession, Mr. Taylor swung at the taser

gun knocking it out of Corporal Thompson's hands, Corporal Thompson swung at Mr. Taylor,

and Mr. Taylor pushed Corporal Thompson onto the floor. *Id.*[2] Next, Mr. Taylor ran towards the

back of the Wal-Mart. UMF ¶ 7. Multiple Wal-Mart shoppers chased after Mr. Taylor following

him outside. Doc. 81 (Exh. C-1) (BN 187) 03:19-20.

Just outside the Wal-Mart, approximately eight civilian shoppers wrestled Mr. Taylor to

the ground. Doc. 205 (Exh. A-1) 03:33-40. When Corporal Thompson caught up to them, the

shoppers kept Mr. Taylor pinned down while Corporal Thompson attempted to handcuff him.

Doc. 205 (Exh. A-1) 03:40-06:00. Mr. Taylor continuously writhed and screamed phrases such

as: "Oh god!" "Call the cops!" and "Call the real police!" After he was handcuffed, the shoppers

and Corporal Thompson unsuccessfully attempted to stand Mr. Taylor up. *Id.* Mr. Taylor tried to

pull away. *Id.* Corporal Thompson instructed the shoppers to "sit him back down. . . put him on

his belly again." *Id.* Once Mr. Taylor was on the ground, a shopper placed his knee on Mr.

Taylor's left shoulder, patting Mr. Taylor on the right shoulder and saying, "Calm down, Bubba.

You're good." *Id.*

Within a few minutes, more officers arrived. *Id.* at 06:00-9:36. Sergeant Brian McCarty

took over for the shopper who had his knee of Mr. Taylor's shoulder. UMF ¶ 17. Sergeant

---

[2] Mr. Taylor asserts that he "never struck or made contact with Thompson, he never fell down, he never dropped his taser. . . ." Doc. 249 at 3. As clearly shown on the video footage, Mr. Taylor is wrong. *See* Doc. 81 (Exh. C-1) (ABN 187) 03:19-20. This factual dispute is not "genuine." *See Adams*, 233 F.3d at 1246.

McCarty put his knee firmly on Mr. Taylor's back. Doc. 205 (Exh. A-1) 06:00-9:36. Corporal

Herrera took Mr. Taylor's shoes off. UMF ¶ 18. Next, the officers tried several times to stand

Mr. Taylor up, but he did not comply. Doc. 205 (Exh. A-1) 06:00-9:36. Eventually, the officers

were able to walk him to the police vehicle. *Id.* Here, the body-worn camera footage stops.[3]

   After a period of time, an ambulance arrived. UMF ¶ 27. Mr. Taylor was transported to

the Carlsbad Medical Center for treatment. UMF ¶ 28.

   Mr. Taylor alleges that on the way to the hospital, he was seated in a police transport

vehicle next to Corporal Thompson. Doc. 109 at 7. Mr. Taylor says that Corporal Thompson

tased him through his handcuffs the entire way to the hospital. *Id.* Mr. Taylor says that this tasing

literally killed him and burned his wrist creating a hole to the bone. *Id.* Mr. Taylor believes that

Corporal Thompson "intentionally killed" him. *Id.*

   In contrast, Mr. Taylor's medical records and an emergency medical technician's

("EMT") affidavit show that Mr. Taylor was transported to the hospital in an ambulance on a

stretcher. Doc. 205-4 (Exh. 3). There is no evidence that Mr. Taylor was tased on the way to the

hospital. There is also no record that any officers accompanied Mr. Taylor in the ambulance. At

least one witness affirmatively swears that there were no officers in the ambulance. *Id.* at 2. The

data reports from Corporal Thompson's taser indicate that it was not used during the time Mr.

Taylor was taken to the hospital. Doc. 193-1 at 6.

   Mr. Taylor's medical records from the Carlsbad Medical Center do not mention burned

skin or a hole in Mr. Taylor's wrist. *See* Doc. 125. The medical records confirm that Mr. Taylor

had no "suspicious burns" and no "unexplained injuries or bruising." Doc. 205-12 at 6, 9. Mr.

---

[3] This incident occurred the year before New Mexico passed a law requiring officers to use body-worn cameras while on duty. *See* N.M. Stat. Ann. § 29-1-18 (2020).

Taylor was treated for rhabdomyolysis due to methamphetamine use and overexertion. Doc. 205-12 at 19. Then, he was taken to the Eddy County Detention Center. UMF ¶ 30.

At some point after the incident, someone posted a video of the altercation to the internet. Doc. 109 at 3–4. The video has never been provided to the Court.

## II.   Plaintiff's Claims

Mr. Taylor's operative complaint lists eight total claims. Doc. 109. Seven of the claims are against various City Defendants. *Id*. Claim six, however, is alleged against only the Carlsbad Medical Center and two doctors. *Id.*; *see also* Docs. 253, 255, 265 (addressing the claims against the hospital and the doctors, respectively).

Claim one is an excessive force claim against Corporal Thompson for tasering and hitting Mr. Taylor inside the Walmart. Doc. 109 at 2–3.

Claim two is a "defamation plus/stigma plus" claim against[4] Corporal Thompson, Sergeant Castaneda, Corporal Cox, and the City of Carlsbad alleging that an unidentified person posted a video of Mr. Taylor's altercation with law enforcement on the internet. *Id.* at 3–4. Mr. Taylor complains that the video posted online does not "show the unconstitutional-ness of how

---

[4] Mr. Taylor also makes this claim and several others against unnamed and unidentified police officers. Doc. 109 at 3–8 (naming as defendants "other police officer bystander," "City of Carlsbad police officers," and a "John Doe Division Captain"). The deadline for Mr. Taylor to amend his pleadings expired September 15, 2023. Doc. 103. Mr. Taylor was provided ample discovery in this case, and he amended his complaint twice. Still, Mr. Taylor has never identified these potential defendants. As such, I recommend that the Court dismiss the claims against them. *Culp v. Williams*, 456 F. App'x 718, 721 (10th Cir. 2012) (unpublished) (condoning the dismissal of John Doe defendants on summary judgment when the *pro se* plaintiff failed to identify them).

Thompson arrived, it has or never had a disclaimer saying his moves on [Mr. Taylor] were unlawful and or arbitrary or unconstitutional."[5] *Id.* at 4.

Claim three is an excessive force claim against Corporal Thompson, Sergeant Castaneda, Corporal Cox, and the City of Carlsbad for the altercation behind the Wal-Mart, which involved several civilian bystanders. *Id.* at 4–5. Mr. Taylor criticizes the officers for "applying force to [his] back and legs twisting [his] legs and removing [his] shoes" while attempting to handcuff Mr. Taylor as he was pinned down by the bystanders. *Id.* He further alleges that Corporal Thompson directed the bystanders to "pick [Mr. Taylor] up walk a couple steps . . . and have [him slammed] down face and head first." Doc. 109 at 4. Finally, Mr. Taylor complains that Sergeant Castaneda applied a "knee-to-neck restraint" suffocating Mr. Taylor for twenty seconds. *Id.* at 4–5.

Claim four is a conspiracy claim against all defendants alleging that Corporal Thompson and Corporal Cox orchestrated a "murder conspiracy machine." *Id.* at 5–6. Mr. Taylor accuses all of the defendants of conspiring with each other to cover up the actions of the "murderous police officers." *Id.*

Claim five is an excessive force claim against Corporal Thompson, Sergeant Castaneda, and Corporal Cox for forcing Mr. Taylor into a police vehicle so that he "could be murdered by Thompson inside." *Id.* at 6–7. Mr. Taylor alleges that he was "tased to death by Corporal Trey Thompson as he sat by [Mr. Taylor's] left shoulder . . . and proceeded to tase [him] to death through [his] left secured handcuff." *Id.* at 7.

---

[5] Unless it is necessary to understand the context, I do not correct any syntax or grammar errors in Mr. Taylor's quotes throughout this opinion to avoid changing the meaning.

Claim seven is a supervisory liability claim against Sergeant Castaneda, Sergeant Griffin, and Lieutenant Cage for hiring Corporal Thompson and failing to train, discipline, or intervene with Corporal Thompson's policing. Doc. 109 at 8. Mr. Taylor argues that the "supervisors should have known [that Corporal Thompson] could have easily violated citizens rights." *Id.*

Claim eight is a municipal liability claim against the City of Carlsbad for allegedly having a policy that directs "all officers in its employment to use force [in response to] any form of civilian resistance." *Id.* at 9.

As relief, Mr. Taylor requests "more than eight figures" in monetary damages, for the officers to be criminally charged, and for the officers to be prevented from working in "government or law enforcement ever again." *Id.* at 10.

III.   **Legal Standard**

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if under the substantive law it could affect the outcome of a lawsuit, and an issue is "genuine" if a rational juror could find in favor of the nonmoving party on the evidence presented. *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citations and quotations omitted). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

Qualified immunity-based summary judgment motions, however, are somewhat different from other summary judgment motions. *See Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995). Qualified immunity shields government officials performing discretionary functions from

liability for civil damages unless the official's conduct violates clearly established statutory or constitutional rights of which a reasonable person would be aware. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). While the initial summary judgment burden is generally on the movant, "[w]hen a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000). After qualified immunity is asserted, the plaintiff must show (1) that the defendant's conduct violated a constitutional or statutory right, and (2) that the law governing the conduct was clearly established when the alleged violation occurred. *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998).

The Court is not required to address the two prongs of the test in order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The Supreme Court's decision in *Pearson* permits courts to grant qualified immunity without first deciding whether a constitutional violation occurred so long as the right claimed to be violated was not clearly established. *Id.* The right that is alleged to have been violated must be "clearly established" not just as a general proposition (for example, in the way the right to free speech is clearly established), but "in a more particularized . . . sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Stating the right too broadly would destroy the balance that the Supreme Court has sought to establish "between the interests in vindication of citizens' constitutional rights and . . . public officials' effective performance of their duties by making it impossible for officials reasonably to anticipate when their conduct may give rise to liability for damages." *Id.* at 639 (quotation and citation omitted).

8

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008) (quotations omitted). "The plaintiff is not required to show, however, that the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) (quotations omitted). The degree of specificity required depends on the egregiousness of the challenged conduct; "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).

Indeed, the doctrine of qualified immunity protects government officials, including police officers, "from undue interference with their duties and from potentially disabling threats of liability." *Harlow*, 457 U.S. at 806. Consequently, section 1983 liability only attaches to "the plainly incompetent or those who knowingly violate the law," *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation omitted), not those who "make reasonable but mistaken judgments." *San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015).

On motion for summary judgment based on qualified immunity, the Court must view the facts and draw all reasonable inferences "in the light most favorable to the party asserting the injury." *Scott v. Harris*, 550 U.S. 372, 377 (2007). Typically, that is the plaintiff. *Id.* at 378. The Court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

9

For purposes of summary judgment, the Court treats a prisoner's complaint as an affidavit if it alleges facts based on his personal knowledge and has been sworn under penalty of perjury. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). The Court also treats a *Martinez* report as an affidavit. *Id.* The Court may use the report and the supporting documents in determining whether to grant summary judgment if the report's statements are based on personal knowledge and are sworn under penalty of perjury. *Id*. The Court cannot resolve material disputed factual issues by accepting a *Martinez* report's findings that conflict with sworn pleadings or affidavits. *Id.* at 1109. As is true with all affidavits, statements of mere belief must be disregarded. *Argo v. Blue Cross & Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006).

Finally, "[a] *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall*, 935 F.2d at 1110. However, "it is [not] the proper function of the district court to assume the role of advocate for the *pro se* litigant." *Id.*

**IV.   Discussion**

The City Defendants collectively assert that they are entitled to qualified immunity on all seven of Mr. Taylor's claims against them. Doc. 205 at 9–21. Mr. Taylor disagrees. Docs. 238, 249. I find that the officer defendants are entitled to qualified immunity, and the City of Carlsbad is not municipally liable.

> **A.   The officers are entitled to qualified immunity for Mr. Taylor's excessive force claims (claims one, three, and five).**

In claims one, three, and five, Mr. Taylor asserts that various officers used excessive force against him. The City Defendants argue that the officers are all entitled to qualified immunity because their use of force was not excessive. Doc. 205 at 9–21. I find that the officers are entitled to qualified immunity.

"When an 'excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment.'" *Emmett v. Armstrong*, 973 F.3d 1127, 1134 (10th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)). When evaluating Fourth Amendment excessive force claims, courts apply an "objective reasonableness standard." *Id.* (citation omitted).

### i.   Mr. Taylor's Response

To succeed, Mr. Taylor must show that the officers violated clearly established law. *See Baptiste*, 147 F.3d at 1255. In other words, he must show that there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Fogarty*, 523 F.3d at 1161. Therefore, before turning to a claim-by-claim analysis, I first summarize all the cases that Mr. Taylor cites in support of his excessive force claims. Mr. Taylor does not differentiate which cases apply to which use of force claims. *See* Doc. 249 at 5–7. So, in the interest of deference to the non-movant, I apply each of his cited cases to all three of his excessive force claims.

The first two excessive force cases that Mr. Taylor cites are insufficient to demonstrate clearly established law. The cases are *Bond v. City of Tahlequah*, 981 F.3d 808 (10th Cir. 2020) and *Montoya v. City of Albuquerque*, No. Civ 03-0261 JB/RHS, 2004 WL 3426436 (D.N.M. May 10, 2004). Doc. 249 at 5–6. The Tenth Circuit's decision in *Bond* was overturned by the Supreme Court because the Tenth Circuit had defined "clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021). Also, *Bond* was decided in 2020, and Mr. Taylor's incident occurred in 2019. Therefore, *Bond* cannot clearly establish the law in 2019. As to *Montoya*, the opinion is an unpublished, district court case, which on its face, cannot clearly establish a law. *See Fogarty*, 523 F.3d at 1161. Further, the legal principle that

11

Mr. Taylor uses *Montoya* to support—that "[a] person has a right to defend himself or herself against a police officer when the police officer uses excessive force to effect an arrest"—is inapplicable here because the subject of this lawsuit is the officers' conduct, not Mr. Taylor's. *See Montoya*, 2004 WL 3426436, at *5 (citing *Fugere v. State, Taxation and Revenue Dep't*, 120 N.M. 29, 36, 897 P.2d 216, 223 (N.M. Ct. App. 1995)). Finally, *Montoya* is based in state law, not federal. For these reasons, both *Bond* and *Montoya* are insufficient to demonstrate clearly established law in this context.

The next set of cases Mr. Taylor cites are equally inapplicable. Mr. Taylor cites a series of cases involving reasonable suspicion to conduct a search. Doc. 249 at 6 (citing *Jones v. Manriquez*, 811 F. App'x 482 (10th Cir. 2020) (unpublished); *United States v. Lowe*, 791 F.3d 424 (3d. Cir. 2015); *United States v. Rogers*, No. 21-6134, 2023 WL152517 (6th Cir. 2023) (unpublished); *United States v. Johnson*, 620 F.3d 685 (6th Cir. 2010)). While those cases and this case both implicate the Fourth Amendment, the standards for reasonable suspicion and excessive force cases are meaningfully dissimilar. Thus, the cited cases do not support Mr. Taylor's arguments here.

Mr. Taylor next cites several excessive force cases that are, in fact, relevant to his claims.

To begin, Mr. Taylor cites six cases that clearly establish that an officer may not use force against a suspect for the purpose of causing the suspect harm unrelated to a legitimate arrest. Doc. 249 at 6–7 (citing *A.D. v. Cal. Hwy. Patrol*, 712 F.3d 446 (9th Cir. 2013); *Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019); *Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008)); *Id.* at 15 (citing *Sacramento v. Lewis*, 523 U.S. 833 (1998); *Lam v. Los Banos*, 976 F.3d 986 (9th Cir. 2020); *Orem v. Rephann*, 523 F.3d 442 (4th Cir. 2008), *abrogated by*, *Brooks v. Johnson*, 924 F.3d 104, 114 (4th. Cir. 2019)). In *Lewis*, the Supreme Court held that an officer who uses force

12

with "a purpose to cause harm unrelated to the legitimate object of arrest," violates the U.S. Constitution. *Lewis*, 523 U.S. at 836. Mr. Taylor also quotes *Porter*, which in turn cites *Lewis*, stating, "*Lewis* contemplates such rare situations where the nature of an officer's deliberate physical contact is such that a reasonable factfinder would conclude the officer intended to harm, terrorize or kill." *Porter*, 546 F.3d at 1141 (quotation omitted). Then, Mr. Taylor quotes *Nehad*, "[i]t is well established that a use of force intended to 'teach a suspect a lesson' or 'get even'" violates the U.S. Constitution. *Nehad*, 929 F.3d at 1139 (quoting *A.D.*, 712 F.3d at 1141). As is relevant to Mr. Taylor's case, *A.D.*, *Lam*, and *Orem* all roughly stand for the same principle— that an officer "violates due process if he acts with a 'purpose to cause harm unrelated to the legitimate object of arrest.'" *A.D.*, 712 F.3d at 454 (citing *Lewis*, 523 U.S. at 836); *see also Lam*, 976 F.3d at 1003 (citing *A.D.*, 712 F. 3d at 453); *Orem*, 523 F.3d at 446. These cases all support Mr. Taylor's argument that it is clearly established that an officer may not use force for objectively vindictive purposes.

Mr. Taylor then cites four excessive force cases that help establish when an officer may use a taser. Doc. 249 at 7 (citing *Emmett*, 973 F.3d at 1134–39; *Casey v. Federal Height*, 509 F.3d 1278 (10th Cir. 2007); *Cavanaugh v. Woods Cross City*, 625 F.3d 661 (10th Cir. 2010)); *Id.* at 14 (citing *Lee v. Tucker*, 904 F.3d 1145 (10th Cir. 2018)). In *Emmett*, the Tenth Circuit held that an officer violated clearly established law when he tased a misdemeanant who had stopped actively resisting without adequate warning. *Emmett*, 973 F.3d at 1136–39. The officer in *Emmett* deployed his taser in the middle of warning the misdemeanant, which did not give the misdemeanant time to comply. *Id.* at 1136. In *Casey*, an officer violated clearly established law when she tased a peaceful citizen without any warning or explanation at all. *Casey*, 509 F.3d at 1287. The Tenth Circuit noted, "it is excessive to use a Taser to control a target without having

any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance." *Id.* at 1286. Similarly, in *Cavanaugh*, an officer violated clearly established law when he tased "a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning." *Cavanaugh*, 625 F.3d at 667. The Tenth Circuit held the same in *Lee*, affirming *Cavanaugh*. *Lee*, 904 F.3d at 1150. These cases help Mr. Taylor define the scope of when an officer may not tase a suspect.

Finally, Mr. Taylor cites four excessive force cases that clearly establish, in relevant part, that an officer may not use force against a suspect that is subdued or not resisting. Doc. 249 at 14 (citing *Wise v. Caffey*, 72 F.4th 1149, 1209 (10th Cir. 2023); *Sam v. Richard*, 887 F.3d 710, 714 (5th Cir. 2018); *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017); *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008)).[6] The particular details of these cases are not material here.

I discuss the applicability of these cases to Mr. Taylor's claims in the following three sections.

### ii.  Corporal Thompson is entitled to qualified immunity for his conduct inside the Wal-Mart (claim one).

Mr. Taylor's first excessive force claim (claim one) is only against Corporal Thompson. Doc. 109 at 2–3. Mr. Taylor alleges that Corporal Thompson used excessive force inside the

---

[6] Mr. Taylor also miscites *Graham v. Connor*, 490 U.S. 386 (1989). Doc. 249 at 14. *Graham* is the case that outlined the legal standard for excessive force cases arising out of investigatory stops. *Graham*, 490 U.S. at 393–99. Mr. Taylor argues that the Supreme Court in *Graham* held that the officer's conduct was unlawful. Doc. 249 at 14. It did not. Instead, the Supreme Court remanded the case for the Court of Appeals to make that determination. *Graham*, 490 U.S. at 399.

14

Wal-Mart when Thompson tased Mr. Taylor and struck him in the mouth.[7] *Id.* I find that Mr. Taylor fails to show that Corporal Thompson violated clearly established law.

The entirety of the altercation in the Wal-Mart is caught on video. Doc. 81 (Exh. C-1) (BN 187) 03:19-20; Doc. 205 (Exh. A-1) 00:09-35. When Corporal Thompson arrived at the Wal-Mart, he attempted to handcuff Mr. Taylor. But Mr. Taylor refused to be handcuffed and started walking away. Mr. Taylor began yelling that the fully uniformed Corporal Thompson was not a real police officer, visibly alarming the Wal-Mart shoppers. Corporal Thompson told Mr. Taylor three separate times to get on the ground. He did not. Corporal Thompson then warned Mr. Taylor twice that he would be tased. Mr. Taylor did not stop or calm down. Corporal Thompson deployed his taser one time, hitting Mr. Taylor in the back. The taser seemingly had no effect.

In response to being tased, Mr. Taylor growled and swung at Corporal Thompson, knocking the taser out of his hand. Corporal Thompson swung back, hitting Mr. Taylor in the mouth. Mr. Taylor pushed Corporal Thompson to the ground and ran off.

Mr. Taylor fails to show that Corporal Thompson's use of force inside the Wal-Mart violated clearly established law. *See Baptiste*, 147 F.3d at 1255.

Starting with the tasing, Corporal Thompson's use of his taser inside the Wal-Mart materially differs from cases where officers violated a suspect's rights by tasing the person. In *Emmett*, *Casey*, *Cavanaugh*, and *Lee,* the officers did not adequately warn the suspect before tasing them. That is simply not true here. Corporal Thompson told Mr. Taylor three times to get

---

[7] It is not clear from the video evidence if Corporal Thompson's swing made contact with Mr. Taylor. In the interest of deferring to the nonmovant, the Court will assume that it did. *See Scott*, 550 U.S. at 377.

on the ground. Corporal Thompson then clearly warned Mr. Taylor twice that he was going to be tased. Instead of following Corporal Thompson's commands, Mr. Taylor continued to walk away, shouting hysterically.

In *Casey*, the Tenth Circuit noted that "[i]t is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command— could not exact compliance." *Casey,* 509 F.3d at 1286. Here, Corporal Thompson tried and failed to get Mr. Taylor to comply with verbal commands. Also, unlike in *Emmett*, *Cavanaugh*, and *Lee*, Mr. Taylor was resisting arrest—he had just refused to be handcuffed and was attempting to get away from Corporal Thompson. It was unclear, unlike in *Cavanaugh* and *Casey*, that Mr. Taylor did not pose a threat to the other Wal-Mart shoppers. Mr. Taylor is a large man, and his behavior was erratic and visibly alarming the store patrons. Mr. Taylor's cited case law does not clearly establish that Corporal Thompson could not tase Mr. Taylor one time, after refusing to comply with orders, after several warnings, and as Mr. Taylor was walking away from him.

The Sixth Circuit decided a similar case involving a tasing, and I agree with its findings. *See Thomas v. Eastpointe*, 715 F. App'x 458 (6th Cir. 2017) (unpublished). In *Thomas*, an officer tased a suspect without warning who refused to comply with the officer's commands and then walked away from the officer. *Id.* at 460–62. After conducting a thorough review of case law, the Sixth Circuit held that "[t]he law is not clearly established that an officer cannot tase a suspect who refuses to comply with a police officer's commands and walks away." *Id.* at 462. Just like the suspect in *Thomas*, Mr. Taylor refused to comply with the officer's commands and walked away. However, unlike in *Thomas* and consistent with Tenth Circuit guidance, Corporal Thompson also warned Mr. Taylor that he would be tased if Mr. Taylor did not comply with his commands.

16

Turning to Corporal Thompson's strike, none of the case law Mr. Taylor provides is applicable. Nor am I aware of any case law that clearly establishes that an officer may not reflexively strike a suspect after the suspect appears to swing at them first. This Court certainly does not condone officers hitting suspects in the face, even when the suspect swings at them first. However, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. While I decline to decide whether Corporal Thompson's strike was reasonable, I am not aware of any "Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts" that clearly establishes that Corporal Thompson's single, instinctive swing and apparent strike in response to being swung at violated Mr. Taylor's rights. *See Fogarty*, 523 F.3d at 1161.

Finally, Mr. Taylor does not provide any evidence for the argument that Corporal Thompson's use of force inside the Wal-Mart was for vindictive purposes—as posited in several of the cases that Mr. Taylor cites. Mr. Taylor accuses Corporal Thompson of "compel[ing] a typical adverse and inflammatory situation," while inside the Wal-Mart, "to only later get revenge on [Mr. Taylor] outside and in the [a]mbulance." Doc. 249 at 7. But Mr. Taylor provides no support for this theory. *See infra* section IV.A.iii-iv (discussing the incidents outside the Wal-Mart and in the ambulance). Mr. Taylor, himself, created the "inflammatory" situation inside the Wal-Mart by resisting arrest, yelling, and walking away from an officer despite the officer's direct orders to get on the ground. There is not "sufficient evidence favoring" Mr. Taylor for a reasonable jury to find that Corporal Thompson's use of force was vindictive. *See Anderson*, 477

U.S. at 249. The law established in *Lewis*, *A.D.*, *Nehad*, *Porter*, *Lam*, and *Orem* does not apply to Mr. Taylor's first excessive force claim.[8]

As such, Mr. Taylor fails to show that Corporal Thompson's use of force inside the Wal-Mart (claim one) violated clearly established law. *See Baptiste*, 147 F.3d at 1255.

### iii.   Corporal Thompson, Sergeant Castaneda, and Corporal Cox are entitled to qualified immunity for their conduct outside of the Wal-Mart (claim three).

Mr. Taylor's claim three is against Corporal Thompson, Sergeant Castaneda, and Corporal Cox for their use of force while arresting Mr. Taylor outside of the Wal-Mart. Doc. 109 at 4–5. I find that Mr. Taylor fails to show that Corporal Thompson, Sergeant Castaneda, and Corporal Cox violated clearly established law for their use of force outside of the Wal-Mart.

### 1.   Material Facts

Mr. Taylor's altercation with the officers outside of the Wal-Mart is entirely captured on Corporal Thompson's body worn camera. Doc. 205 (Exh. A-1) 03:33-9:36. Mr. Taylor's version of events, as described in the operative complaint, significantly differs from the video footage.

Particularly, the footage shows that Mr. Taylor was pinned to the ground outside of the Wal-Mart by a group of civilian shoppers. Mr. Taylor argues that "excessive force was applied to [him] as [he] was already completely restrained." Doc. 109 at 4. The footage, though, contradicts the claim that he was "completely restrained" while on the ground. Instead, Mr. Taylor is seen thrashing, screaming, and appears to be trying to escape.

Next, Mr. Taylor complains that Corporal Thompson was "twisting [Mr. Taylor's] legs and removing [his] shoes to make [him] look like [he] was out of [his] mind by disrobing." *Id.*

---

[8] Mr. Taylor does not argue that he was subdued while inside the Wal-Mart, nor does the video evidence support such a claim. As such, *Wise*, *Sam*, *Alexander*, and *Bush* are inapplicable to claim one.

No jury could reasonably find that Corporal Thompson was attempting to disrobe Mr. Taylor. *See Anderson*, 477 U.S. at 248. While an officer did remove Mr. Taylor's shoes, UMF ¶ 18, doing so necessarily resulted in some maneuvering of Mr. Taylor's leg akin to when an adult struggles to take the shoes off a rambunctious toddler.

Mr. Taylor states that Corporal Thompson directed the shoppers to "pick [Mr. Taylor] up" and "have [him slammed] down face and head first busting [his] lip and injury to [his] chin and leg-knees." Doc. 109 at 4. The footage does show that while trying to make him walk to the police car, the civilians lifted and then had to lower Mr. Taylor back to the ground. Doc. 205 (Exh. A-1) 04:55-05:35. But doing so was plainly unavoidable, was not violent, and was caused by Mr. Taylor's unwillingness to walk himself. Corporal Thompson never directed the shoppers to drop Mr. Taylor, nor did any other officers.

Mr. Taylor finally complains that Sergeant Castaneda[9] used a "knee-to-neck restraint applying his full body weight" on a "completely restrained and handcuffed and outnumbered" Mr. Taylor, which "suffocated [him] for 20 seconds." Doc. 109 at 4–5. Mr. Taylor describes this use of force as a "Derek Chauvin knee." Doc. 249 at 5. Yet, the footage shows that no officer ever had their knee on Mr. Taylor's neck. At one point one officer did have his knee pressed against Mr. Taylor's back to prevent him from escaping. At this point, Mr. Taylor was still actively writhing and screaming. But it is plain from the video footage that the officer did not

---

[9] In this motion, for the first time, the City Defendants inform the Court that it was actually Sergeant McCarty, not Sergeant Castaneda who had his knee against Mr. Taylor's back. Doc. 205 at 11. In his response, Mr. Taylor accepts the identity as true. Doc. 249 at 5. The identity is immaterial because neither officer put their knee on Mr. Taylor's neck, as he alleges.

place his full body weight against Mr. Taylor, let alone against his neck. *See Anderson*, 477 U.S. at 248.

### 2.   The law is not clearly established that the officers' use of force outside the Wal-Mart violated clearly established law.

Mr. Taylor fails to show that the officers' use of force outside of the Wal-Mart violated clearly established law. *See Baptiste*, 147 F.3d at 1255.

None of the cases that Mr. Taylor cites are applicable to the use of force outside of the Wal-Mart. First, *Emmett*, *Casey*, *Cavanaugh*, and *Lee* each deal with the use of a taser. However, Mr. Taylor was not tased outside of the Wal-Mart. Second, *Wise*, *Sam*, *Alexander*, and *Bush* caution against the use of force against someone who is subdued or not actively resisting. But Mr. Taylor was *not* subdued outside of the Wal-Mart, and in reality, was actively resisting officers and individuals attempting to help the officers. Third, *Lewis*, *A.D.*, *Porter*, *Nehad*, *Lam*, and *Orem* are also inapplicable because there is no evidence that the officers were intending to harm Mr. Taylor. While Mr. Taylor argues that he was intentionally dropped, suffocated, and slammed to the ground, the video shows that these claims are significantly exaggerated. The officers did not injure Mr. Taylor beyond minor scrapes and potentially bruising. They did not intentionally drop Mr. Taylor. No officer, or civilian, put their knee on Mr. Taylor's neck. The officers did not keep Mr. Taylor on the ground for longer than necessary. Overall, the officers use of force was measured, and Mr. Taylor fails to show that they violated clearly established law. *See Baptiste*, 147 F.3d at 1255.

Corporal Thompson, Sergeant Castaneda, and Corporal Cox are entitled to qualified immunity for their use of force outside of the Wal-Mart (claim three).

>    iv.    **Corporal Thompson, Sergeant Castaneda, and Corporal Cox are entitled to qualified immunity for their conduct while allegedly transporting Mr. Taylor (claim five).**

In claim 5, Mr. Taylor makes claims against Corporal Thompson, Sergeant Castaneda, and Corporal Cox for their alleged use of force while transporting Mr. Taylor to the Carlsbad Medical Center. Doc. 109 at 6–7. I find that the City Defendants are entitled to qualified immunity because Mr. Taylor is unable show that his rights were violated while in transport to the hospital.

No jury could reasonably believe the factual basis of claim five. *See Anderson*, 477 U.S. at 249. Mr. Taylor accuses Corporal Thompson of "murder[ing]" him by "intentionally" tasing Mr. Taylor "to death" on the drive to the hospital. Doc. 109 at 6–7. Mr. Taylor claims that Corporal Thompson continuously tased him through his left handcuff throughout the ride. *Id.* at 7. Mr. Taylor adds that Corporal Cox and Sergeant Castaneda are liable for "putting [Mr. Taylor] into the transport" vehicle with Corporal Thompson. *Id.* at 6. However, the allegations in claim five are inconsistent, illusory, and unsupported by any of the extensive evidence in this case.

First, Mr. Taylor has no evidence of injuries from the ambulance ride.[10] He obviously was not killed by Corporal Thompson as Mr. Taylor is alive and well today proceeding in this matter *pro se*. There is no evidence of the hole in Mr. Taylor's wrist that allegedly went down to his bone. After his altercation with the officers, Mr. Taylor was immediately taken to the hospital. One of the EMTs who transported Mr. Taylor completed and signed an affidavit. Doc. 205-4 (Exh. 3). The EMT was with Mr. Taylor for his entire drive, providing him direct patient

---

[10] Mr. Taylor alleges that he has a scar from being tased to death on the way to hospital. He has not provided any evidence of that scar. And even if he did, it would not prove that the scar came from being repeatedly tased on the way to the hospital.

21

care. *Id*. at ¶ 8. The EMT does not corroborate Mr. Taylor's claimed injuries, including his alleged death. Instead, the EMT states that "Mr. Taylor was screaming and rambling," during the drive. *Id.* at ¶ 9. Mr. Taylor's medical records from the date of the incident also do not indicate that he died and came back to life. *See* Doc. 125. The medical records show that Mr. Taylor was not meaningfully injured during his altercation, and he was under the influence of methamphetamines. *Id.* Mr. Taylor does not point to anyone—a nurse, doctor, fellow patient, EMT, officer, jail staff member, or any bystander—that is willing and able to corroborate his claim that he was murdered, or even seriously injured.

Second, Corporal Thompson's taser was never deployed while Mr. Taylor was *en route* to the hospital. The taser data reports confirm Corporal Thompson's claim that he only tased Mr. Taylor one time, and it happened inside the Wal-Mart. Corporal Thompson did not deploy his taser again that day. Mr. Taylor asserts that the taser data is "incorrect." Doc. 249 at 3. But Mr. Taylor has no evidence to support this assertion, nor does he explain why the taser data would be inaccurate. *See Anderson*, 477 U.S. at 248.

Third, Corporal Thompson was not with Mr. Taylor when he was transported to the hospital. Indeed, no officer was with him. Mr. Taylor was taken to the hospital by three EMTs. Doc. 205-4 (Exh. 3). An EMT who was with Mr. Taylor for the entire ride to the hospital swears under oath that Mr. Taylor was not tased on the way. *Id*. at ¶¶ 8, 14. For several years, Mr. Taylor claimed that he was taken to the hospital in a police transport vehicle with Corporal Thompson seated next to him and driven by another police officer. Doc. 1 at 3. There is simply no evidence to support this claim. Mr. Taylor now admits that he was taken to the hospital in the ambulance. Doc. 249 at 7. The evidence shows that Mr. Taylor was transported on a gurney, in an ambulance, and there were no officers in the vehicle with Mr. Taylor.

For a juror to believe that Corporal Thompson tased Mr. Taylor to death, the juror would have to find that (1) Mr. Taylor died in the ambulance and was resuscitated at the hospital, (2) the doctors who saved Mr. Taylor's life covered up their accomplishment, (3) the doctors conspired with the nurses and all other medical staff to falsify Mr. Taylor's medical records at regular intervals to indicate that he was only mildly harmed, (4) the EMT lied about taking Mr. Taylor to the hospital and having ever met Mr. Taylor, (5) every officer present at Mr. Taylor's arrest falsified their reports or affidavits, (6) a separate person falsified the taser's data reports, and (7) the officers, their supervisors, the hospital, the doctors, nurses, staff, EMTs, the jail, and every bystander conspired together to hide that Corporal Thompson tased Mr. Taylor causing him to temporarily die. Such a finding is plainly irrational. With no evidence to support these facts, and substantial evidence to rebut them, no reasonable jury could believe the factual basis of Mr. Taylor's claim five allegations. *See Anderson*, 477 U.S. at 248.

Mr. Taylor fails to establish that his rights were violated. Therefore, Corporal Thompson, Sergeant Castaneda, and Corporal Cox are entitled to qualified immunity as to claim five.

### B.    Corporal Thompson, Sergeant Castaneda, and Corporal Cox are entitled to qualified immunity for the "defamation plus/stigma plus" claim (claim two).

In claim two, Mr. Taylor asserts a "defamation plus/stigma plus" claim against Corporal Thompson, Sergeant Castaneda, Corporal Cox, and the City of Carlsbad because an unidentified person posted a video of Mr. Taylor's altercation with law enforcement on YouTube. Doc. 109 at 3–4. The City Defendants argue that the officers are entitled to qualified immunity as to claim two because Mr. Taylor's rights were not violated. Doc. 205 at 21–24. I agree.

The proper framework for Mr. Taylor's stigma plus claim is the procedural due process clause of the Fourteenth Amendment. *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1229. "[C]ourts 'ask two questions' when considering procedural-due-process claims: "(1)

23

Did the plaintiff possess a protected property or liberty interest to which due process protections apply? And if so, (2) was the plaintiff afforded an appropriate level of process?" *Id.* To show that plaintiff possessed a protected liberty interest, there are "two sub-elements: 'that (1) the government made a false statement about [the plaintiff] . . . that was sufficiently derogatory to injure his reputation, and that (2) [the plaintiff] experienced a governmentally imposed burden that significantly altered his status as a matter of state law.'" *Id.* at 1230 (citation omitted).

Mr. Taylor's stigma-plus claim fails because he does not allege that "the government made" a false statement about him. *See id.* As the City Defendants note, Mr. Taylor "concedes that a civilian recorded this video." Doc. 258 at 23 (citing Doc. 109 at 3). Mr. Taylor does not allege that an officer posted the video. Instead, Mr. Taylor says that "the person who posted the video has to have been given the personal info of mine by a police officer who was getting s[**]t out of my pockets in the parking lot." Doc. 249 at 8. However, this allegation is insufficient to establish that the government is responsible for a layperson posting a video on their own accord. Mr. Taylor fails to assert that the government "made" the false statement.

Mr. Taylor also fails to show that any statements that were made were "false."  Mr. Taylor complains that the video did not have "a disclaimer saying [Corporal Thompson's] moves on [Mr. Taylor] were unlawful and or arbitrary or unconstitutional." Doc. 109 at 4. However, it is unclear how this lack of disclaimer affects the accuracy of the video. There is no allegation that the video was altered in any way. Mr. Taylor fails to show that the video contained any false statements.

Finally, Mr. Taylor complains that the "police here have officially imposed on respondent the stigmatizing label 'criminal' without the statutory and constitutionally mandated safeguards in a criminal trial." Doc. 249 at 8. However, the video, as Mr. Taylor describes it, does not label

Mr. Taylor a "criminal." It merely depicts Mr. Taylor's conduct, as well as the officers' conduct, as it happened. Mr. Taylor argues that "[i]mputing criminal behavior to an individual is generally considered defamatory per se." *Id.* (quoting *Paul v. Davis*, 424 U.S. 693, 697 (1976)). But the tort of defamation and a claim of defamation arising under the procedural due process clause use different legal standards. Further, *Paul* does not support Mr. Taylor's claim. In *Paul*, the Supreme Court held that the plaintiffs did not have a protected liberty interest in not being labeled "active shoplifters" without due process. *Paul*, 424 U.S. at 712. Much like the plaintiffs in *Paul*, Mr. Taylor fails to show that he was deprived of a protected liberty interest.

Because Mr. Taylor fails to show that Corporal Thompson, Sergeant Castaneda, and Corporal Cox violated his rights when an unrelated, third-party posted a video of his arrest, the officers are entitled to qualified immunity as to claim two. *See Baptiste*, 147 F.3d at 1255.

## C. The City Defendants are entitled to qualified immunity for Mr. Taylor's conspiracy claim (claim four).

Mr. Taylor alleges in claim four that "multiple law enforcement officers as shown in [the] caption" conspired with each other, the Carlsbad Medical Center, and its doctors to cover up Corporal Thompson allegedly tasing him to death. Doc. 109 at 5–6. The City Defendants argue that the officers are entitled to qualified immunity for claim four because Mr. Taylor's rights were not violated. Doc. 205 at 24–26. I agree.

It is unclear whether Mr. Taylor alleges a conspiracy under 42 U.S.C. § 1983 or § 1985(3). So, I analyze his conspiracy claim under both statutes.

A § 1983 conspiracy is "a conspiracy to deprive a plaintiff of a constitutional or federally protected right under color of state law." *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022) (citation omitted). A § 1985(3) conspiracy is, in relevant part, a conspiracy "for the purpose of

25

depriving . . . any person or class of persons of the equal protection of the laws, or of equal

privileges and immunities under the laws." 42 U.S.C. § 1985(3). A § 1985(3) conspiracy requires

a showing of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus

behind the conspirators' action." *Jones v. Norton*, 809 F.3d 564, 578 (2015) (quotation omitted).

 Sections 1983 and 1985(3) "do not create independent substantive rights; they are procedural

statutes which provide a remedy for deprivation of existing rights." *Dixon v. Lawton*, 898 F.2d

1443, 1448 (10th Cir. 1990) (citations omitted). Conclusory allegations of conspiracy are

insufficient to state a claim under both § 1983 and § 1985(3). *Bledsoe*, 53 F.4th at 609 (§ 1983);

*O'Connor v. St. John's College*, 290 F. App'x 137, 141 (10th Cir. 2008) (unpublished)

(§ 1985(3)).

Mr. Taylor's conspiracy claim fails, under both § 1983 and § 1985(3), because he fails to

show an underlying deprivation of rights. The City Defendants argue, and I agree, that

"[p]laintiff cries conspiracy without proof much less an underlying constitutional violation and

some related affirmative acts or injury resulting from this supposed conspiracy." Doc. 205 at 25.

Mr. Taylor claims that Corporal Cox "knowingly conspired to attempt to covertly kill [him] in

association with Thompson." Doc. 109 at 5. He explains, "Cox had to have heard the taser going

off" when Corporal Thompson was allegedly tasing Mr. Taylor to death on the way to the

hospital. *Id.* As explained in section IV.A.iv., however, no reasonable jury could believe that

Corporal Thompson tased Mr. Taylor on the way to the hospital. *See Anderson*, 477 U.S. at 248.

As such, Corporal Cox could not have conspired to cover up a tasing that never occurred.

Mr. Taylor further claims that the officers all conspired with the hospital, its staff, and its

doctors to cover up the tasing that occurred on the way to hospital. Doc. 109 at 4–5. Again,

because such a tasing did not occur, no reasonable jury could find that the officers conspired to

cover it up. Although Mr. Taylor conclusively claims that "there is a clear concerted effort to conceal and extensively fabricate all matter of official and medical record documentation as provided in discovery to cover up this evil and malicious official misconduct," there is simply no evidence to support these allegations. Doc. 249 at 9. No reasonable jury could find an underlying deprivation of rights to support a conspiracy claim. *See Anderson*, 477 U.S. at 248.

Because Mr. Taylor's rights were not violated, the officers are entitled to qualified immunity as to claim four.

> **D.     Mr. Taylor fails to establish a municipal liability claim against the City of Carlsbad (claim eight).**

Mr. Taylor's claim eight is a municipal liability claim against the City of Carlsbad. Doc. 109 at 9. Claims two and three are also made against the City of Carlsbad, but the City itself may only be held liable on a theory of municipal liability. *See George v. Beaver Cnty.*, 32 F.4th 1246, 1253 (10th Cir. 2022). The City Defendants argue that the municipal liability claim fails because there is no underlying constitutional violation. Doc. 205 at 26–28. I find that Mr. Taylor is unable to establish the elements for a municipal liability claim.

"[M]unicipalities are responsible only for their own illegal acts and 'are not vicariously liable under § 1983 for their employees' actions.'" *George* 32 F.4th at 1253 (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)). To establish municipal liability, "a plaintiff must prove that (1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring." *Id.* (citation omitted). An official custom or policy may take one of the following forms:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express

municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Walker v. Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (citation omitted). "[A]fter establishing a municipal policy or custom, a plaintiff must demonstrate a direct causal link between the policy or custom and the injury alleged." *Id.* at 1284 (quotation omitted). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* (citation omitted).

Mr. Taylor accuses the City of Carlsbad of having a policy that directs "all officers in its employment to use force [in response to] any form of civilian resistance." Doc. 109 at 9. Mr. Taylor's only evidence of this policy is a document that Corporal Thompson filled out titled "[Force] Response to Resistance Form," and the City's formal response to resistance policy, which Mr. Taylor calls the "Use of Force packet." *Id.*; *see also* Docs. 81-9 (Exh. E) (Corporal Thompson's [Force] Response to Resistance Form), Doc. 81-18 (Exh. H-6) (City's response to resistance policy, as was effective at the time of the incident). Mr. Taylor argues that these documents "directly promote[] and encourage[] all police officers to use force on any form of civilian resistance." Doc. 249 at 10.

Mr. Taylor is not able to establish that such a policy exists. The two documents that Mr. Taylor points to do not support his claim. First, Corporal Thompson's "[Force] Response to Resistance Form" is an official form that he was required to fill out after using force while arresting Mr. Taylor. Doc. 81-18 (Exh. H-6). The document itself does not provide official

guidance, and it does not suggest that the use of force is always warranted. *Id.* To the contrary, in reviewing Corporal Thompson's conduct, his supervisor wrote that, despite the "dynamic fast evolving chain of events . . . if [Corporal]Thompson could have used defensive tactics to deflect [Mr. Taylor's] attack that would have been more favorable," indicating that force was not necessarily the preferred tactic. Doc. 81-9 (Exh. E) at 3. Second, the City's official response to resistance policy also does not support Mr. Taylor's claim. Instead, the policy states that, "[a]n officer shall use only the degree of force that is objectively reasonable under the circumstances and only to effect lawful objectives." Doc. 81-18 (Exh. H-6) at 1. The policy allows an officer to "decid[e] whether to use force to respond to a perceived threat," within the bounds of the law. *Id.* at 4. The policy does not *require* an officer to use force in response to resistance. As there is no evidence to support the existence of this policy, no reasonable jury could find that it exists. *See Anderson*, 477 U.S. at 248.

And even if such a policy existed, Mr. Taylor does not draw a causal link between the officers' use of force inside or outside the Wal-Mart and this alleged policy. Notably, the use of force to effectuate an arrest is not inherently unlawful so long as it is objectively reasonable. *Emmett*, 973 F.3d at 1134.

Mr. Taylor is unable to satisfy the elements to establish municipal liability; therefore, the City of Carlsbad is not liable.

### E.   Mr. Taylor fails to establish a supervisory liability claim against the City Defendants (claim seven).

Claim seven is a supervisory liability claim against Sergeant Castaneda, Sergeant Griffin, and Lieutenant Cage for hiring Corporal Thompson and for failing to train, discipline, or intervene with Corporal Thompson's policing. Doc. 109 at 8. The City Defendants argue that the officers are entitled to qualified immunity because Mr. Taylor's rights were not violated. Doc.

205 at 28–31. While I agree that that Sergeant Castaneda, Sergeant Griffin, and Lieutenant Cage are entitled to qualified immunity, I instead find as such on claim seven because Mr. Taylor fails to show that the officers violated clearly established law.[11]

"[I]n a § 1983 lawsuit, supervisory liability allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, or implements a policy which subjects, or causes to be subjected that plaintiff to the deprivation of any rights secured by the Constitution." *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015) (cleaned up) (citations omitted). A supervisor can only be held liable when there is an affirmative link between the supervisor's "adoption or implementation of a policy and a deprivation of federally protected rights." *Dodds v. Richardson*, 614 F.3d 1185, 1202 (10th Cir. 2010). Even under a theory of supervisory liability, as with any valid assertion of qualified immunity, plaintiff must show that the officer's conduct violated clearly established law. *See id.* at 1206.

As discussed above in detail above, Mr. Taylor fails to establish that the officers' conduct in this case violated clearly established law. Mr. Taylor never addresses the officers' defense of qualified immunity for the supervisory liability claim. Instead, in the portion of his motion that references the supervisory liability claim, Mr. Taylor accuses the officers of "sanctionable conduct" throughout the discovery process. Doc. 249 at 10. While Mr. Taylor meaningfully cites case law throughout his response, he fails to do so to support his supervisory liability claim. Nor am I aware of any clearly established law that would support Mr. Taylor's claim.

---

[11] In finding that the officers did not violate clearly established law, I make no finding one way or the other as to whether Mr. Taylor's rights were violated by the officers.

As Mr. Taylor fails to establish that Sergeant Castaneda, Sergeant Griffin, and Lieutenant Cage violated clearly established law, the officers are entitled to qualified immunity for his claim seven supervisory liability allegations. *See Baptiste*, 147 F.3d at 1255.

**V. Recommendation**

In sum, Mr. Taylor's eight claims against the City Defendants each fail. I recommend that the Court find that the officers are entitled to qualified immunity and that the City of Carlsbad cannot be held municipally liable. While Mr. Taylor's complaint is based on a real arrest, the video evidence shows that his allegations are grossly exaggerated and that they are not based on the reality of the events of February 3, 2019. I therefore recommend that the Court grant the City Defendants' Motion for Summary Judgment (Doc. 205), dismissing all claims against them with prejudice. Finally, I recommend that the Court dismiss any outstanding claims against any unnamed and unidentified police officers as the deadline for Mr. Taylor to amend his pleadings expired on September 15, 2023. *See supra* n.4.

Should the Court adopt this Proposed Findings and Recommended Disposition, no claims will remain in this case. As such, I recommend that the Court deny as moot the following outstanding motions:

- Plaintiff's Motion to Appoint Receiver (Doc. 185)
- Plaintiff's Motion for Protective Order (Doc. 186)
- Plaintiff's Motion for Order to Attach Property (Doc. 200)
- Plaintiff's Motion for Discovery Sanctions (Doc. 208)
- Plaintiff's Motion for the Court to Direct the U.S. Marshall to Administer Personal Service (Doc. 219)

- Plaintiff's Renewed Motion for Rule 37 Discovery Sanctions (Doc. 228)

- Plaintiff's Motion for Summary Judgment (Doc. 239)

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). Written objections must be both timely and specific.** *United States v. One Parcel of Real Prop., With Buildings, Appurtenances, Improvements, & Contents, Known as: 2121 E. 30th St., Tulsa, Oklahoma*, **73 F.3d 1057, 1060 (10th Cir. 1996). A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. Failure to file timely and specific objections will result in waiver of** *de novo* **review by a district or appellate court.** *Id.* **In other words, if no objections are filed, no appellate review will be allowed.**

---

JENNIFER M. ROZZONI
United States Magistrate Judge